# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

THERESA BAUTISTA,                                    No. Civ. 00-1741 WJ/LFG-ACE

ETHEL CAMPBELL,                                      No. Civ. 01-86 BB/LFG

MARIA DELALUZ GARCIA,                                No. Civ. 01-910 WJ/LFG
ARTHUR E. FISHEL, YVONNE PERALTA,
EUSEBIO MEDINA, JUAN VARGAS,
TONY CANDELARIA, PHYLLIS MONTOYA,
RITA WOOD, AND ROBERT TORRES,

                    Plaintiffs,

vs.

HONEYWELL, INC. [sic], a Delaware Corporation,

                    Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on the following motions filed by Defendant

Honeywell, Inc., predecessor to Honeywell International, Inc. (Defendant or Honeywell):

(1)  Motion for Partial Summary Judgment on Plaintiffs' Race and Age Discrimination Claims,

filed March 5, 2002 [00cv1741, Doc. No.  33]; (2) Motion for Partial Summary Judgment on

Plaintiffs' ERISA Claims, filed March 6, 2002 [00cv1741, Doc. No. 37]; and (3)  Motion for

Partial Dismissal or Partial Summary Judgment on Plaintiffs' Fraud, Negligent Misrepresentation,

and[/or] Promissory Estoppel Claims, filed March 7, 2002 [00cv1741, Doc. No. 42].[1]  The Court,

having read the motions, memoranda, and exhibits submitted by the parties, and being apprised of

---

[1]On April 29, 2002, Campbell, 01cv86, and Garcia, et al., (Garcia), 01 cv910, were consolidated
for all purposes into Bautista, the earliest filed case.  Order of Consolidation, filed April 29, 2002
(00cv1741, (Doc. No. 50).  Docket citations in this Opinion for documents or pleadings filed after the April
2002, consolidation order refer to Bautista, 00cv1741.

the applicable law, concludes that the motion as to Plaintiffs' discrimination claims will be granted

and the remaining motions for the most part will be denied.

## I.    BACKGROUND

This action arises out of an employer-employee relationship between Plaintiffs and

Defendant.  Jurisdiction is pursuant to 28 U.S.C. § 1331 (original jurisdiction over federal

questions) and, the Court assumes[2], 28 U.S.C. §1367(a) (supplemental jurisdiction).  In their

complaints, Plaintiffs allege federal law claims under the Employee Retirement Income Security

Act of 1974 (ERISA), 29 U.S.C. § 1001, et seq.; Title IV of the Civil Rights Act of 1964, 42

U.S.C. § 2000e, et seq., as amended; 42 U.S.C. § 1981; and/or the Age Discrimination in

Employment Act (ADEA), 29 U.S.C. § 621, et seq.  Further, Plaintiff Bautista brings a state law

claim for fraud; Plaintiff Campbell brings state law claims for promissory estoppel, fraud, and,

arguably, age discrimination under the New Mexico Human Rights Act, NMSA § 28-1-1, et seq.

(2000 Repl. Pamp.); and the Garcia Plaintiffs each bring a state law claim for fraud and negligent

misrepresentation.  All remaining state law claims brought by Plaintiffs in their original and/or

amended complaints have been dismissed.

In 1999 and 2000, Defendant formulated, planned, and/or implemented "Project Cortez"

to outsource some of its Albuquerque Home and Building Controls Division (H&BC) products.

Specifically, under Project Cortez, printed wire board assemblies (Boards) manufactured at

Defendant's Bluewater plant in Albuquerque would be outsourced to a Malaysian company, In-

---

[2]The basis for the Court's jurisdiction over Plaintiffs' state law claims is unclear.  Given the lack of agreed upon jurisdictional facts, the lack of any allegations regarding the amount(s) in controversy, and Plaintiffs' jurisdictional allegations, the Court assumes that its jurisdiction over Plaintiffs' state law claims is as asserted by Plaintiffs - supplemental (or pendent) under 28 U.S.C. §1376(a).

Tec Global (ITG), and some or all of Defendant's Legacy product line (manufactured in space leased from Defendant's Albuquerque Defense Avionics Division facility (DAS)) would be outsourced to Albuquerque company Quatro Corporation (Quatro).[3]  The announced result of the ITG outsource portion of Project Cortez was the layoff of approximately two-thirds of Defendant's Albuquerque workforce, about 200 employees.  It appears from the record that the two subparts of Project Cortez were conceived of concurrently, in mid- to late-1999, and the formal cancellation of the Malaysian subpart of Project Cortez occurred at or about the same time period as the implementation or completion of the Quatro subpart, in late Spring/early Summer 2000.

## A.      Project Cortez - Malaysian/Quatro Outsource

In July 1999, at an Albuquerque employee meeting, Defendant discussed Project Cortez, the outsourcing of its Board work, and Albuquerque "Honeywell's closing."  See Def.'s Ex. C at 25-29.  On October 19, 1999, at a Key Messages/All Employee Meeting, Defendant informed its workforce that a decision had been made to outsource its Board work, it had shared the information regarding Project Cortez that was available to it, and it would "continue to be open and honest and to share the information" it had.  Def's Ex. A-1 at ¶ 6.  Defendant advised that it

---

[3]As discussed below, Defendant and its counsels' interpretation of Project Cortez's scope is less than clear.  Based upon the record, the Court concludes that Project Cortez encompassed both the international and the local outsourcing plans.  Adding to the factual jumble, it appears that before and during Project Cortez, Defendant had many irons in the fire (and sources of Albuquerque employee unease), including a merger, an acquisition, a possible sale of the Bluewater facility, a change in the Albuquerque charter, the "Optimized" Albuquerque plan, the "Leaned" Albuquerque plan, the "New Albuquerque" plan, and/or the possible outsourcing of the final assembly of its Board work.  It is unspecified whether the outsourcing of the final assembly of Defendant's Board work was part of Project Cortez and how it (and any of the other actions listed above) affected the alleged belief that Defendant was closing.

expected the overall transition to take close to 24 months, with no impact to regular employees for 3-6 months.  Id. at ¶ 3.  Defendant further informed there were over 50 subcontract workers who would be impacted first.  Id.

On November 9, 1999, Rick Matthews of H&BC notified "all employees" by an interoffice correspondence that "as part of an ongoing, Honeywell-wide initiative" to increase competitiveness and reduce costs, "the H&BC Products leadership team had decided to outsource the [Board] work currently being performed here in Albuquerque. . . ."  Defendant further informed that an outsource supplier would be identified by year end, that final transfer of all Board products would occur over the next 18 to 24 months, and that the decision affected about 200 of the 300 Albuquerque employees.  Def.'s Ex. A-2.  Defendant reiterated its previous message that it would "continue to provide progress reports to employees as [it] continued to identify a [Board] supplier and develop product and people transition plans."  Id.

A November 24, 1999, Statement to the New Mexico Business Journal, published November 26, 1999, informed of Defendant's pursuit of an opportunity to outsource its Board work and that Defendant had informed its employees "of this potential action more than a month ago."  Pls.' Ex. 22.  A copy of the published statement was to be issued to employees.  Id.  Before publication, a draft of the Statement was revised by Defendant to remove the sentence: "This action is still under review and is still subject to change."  Id.  From the handwritten notes on the statement draft, one could infer that the sentence was removed because it conflicted with what Defendant had informed, or was planning to inform, its employees in October, November, and/or

4

December 1999.[4]  Id.; see Pls.' Resp. (Doc. No. 45) at 17 ¶ g; but see Pls.' Ex. 22 (The New Mexico Business Journal Statement, provides that Defendant had informed its employees "of this potential action." (emphasis added)).

Late on December 7, 1999, Defendant e-mailed a copy of a December 6, 1999, announcement to H&BC Products Employees from the President of H&BC's Products Business that, as part of an initiative to cut costs and increase its competitiveness, the H&BC Products leadership team had decided to outsource the Albuquerque Board work.  Def.'s Ex. A-3.  The e-mail announced that outsourcing of all Board work produced at Albuquerque would occur over the next 18 months. (This timetable is in contrast to the November 9, 1999, notice of 18-24 months and the October 19, 1999, estimate of close to 24 months.)  The e-mailed announcement also provided that the Board outsourcing decision "affects about 200 of the 300 [Albuquerque] employees" and that "there will be some layoffs" beginning with contract workers.  Def.'s Ex. A-3.

On January 18, 2000, Defendant advised through a Key Messages/All Employee Meeting/Question and Answers (Q&A) that the Board outsource supplier identified was In-Tec Global (ITG), located in Johor Bahru, Malaysia.  Def.'s Ex. A-4 at 2.  Defendant further informed that it was currently in the process of negotiating a contract with ITG and stated that a secondary supplier had been identified in the event that ITG was not successful as a supplier.

On February 15, 2000, a Cortez Executive Review Board Meeting was held, during which the ITG/Board outsourcing (including development of a contingency plan), the Legacy Product

---

[4]The handwritten notes on the New Mexico Business Journal Statement draft include:  "Take out;" "Message to all employees.  Issue with Action still under review and subject to change;" and "Will take out statement."  Pls.' Ex. 22.

5

outsourcing, and retention plans were discussed and decisions made. Pls.' Ex. 16 at a-c.  In addition, "action" assignments were given to Defendant's management employees.  Id.

On April 11, 2000, employees were informed through an All Employee Meeting/Key Messages/Q&A that there were over 60 subcontract workers and Defendant did not expect to issue any notices to any regular employees during the second quarter.  Def.'s Ex. A-6 at 1, 2 ¶ 4.

On May 16 or May 17, 2000, Defendant's (Albuquerque) Human Resources (HR) Manager, Susan Kline, sent an e-mail and/or facsimile to individuals who appear to be either Defendant's in-state or out-of-state management employees.  The message advised that the May 15, 2000, date to formally notify the State of New Mexico of Defendant's intentions to downsize its workforce (WARN notice) had been revised based on changes in the Project Cortez time line and the anticipation that, due to the size of its subcontract workforce, the subcontract workforce would be the group to feel the impact in 2000.  Pls.' Ex. 23.  The message stated that the regular workforce might be provided notice in late 2000, with a severance date of 2001, and that the revised State notification date was "targeted for the September timeframe [sic]."  Id.  There is no evidence that Defendant specifically relayed the information regarding the change in the time frame for the WARN notice to its non-management employees.  Cf. Pls.' Ex. 19 at 60.

On May 18, 2000, in response to an All Employee Meetings/Q&A question asking that if Defendant experienced "further and serious setbacks with Project Cortez," would the Minneapolis Cortez Executive Committee reverse its decision to outsource the Board work, Defendant stated: "It's unlikely that the decision will be reversed at this point.  If there are serious setbacks or negative business impacts, discussions will take place and recovery plans developed."  Def.'s Ex. A-7 at 1, 3-4.  At the same meeting, in response to the question: "Malaysia rumor is that

everything is messed up over there.  What's up with the contract?," Defendant stated:  "We are currently 7 weeks behind plan. . . .  Recovery plans are being developed . . . .  Currently, we do not have a signed contract [with ITG.  Management employees] are traveling to Malaysia on May 22nd to address and resolve the 10 key issues with the contract."  Id. at 4.  In response to a question regarding if and how a delay in product transition would affect layoffs, Defendant stated that it anticipated that no regular employees would be laid off during 2000 as a result of Project Cortez, but that some employees might receive their 60-day notice late in 2000, with a severance date of early 2001.  Id. at 5.

In October 1999, to reduce attrition and ensure that sufficient employees remained until any potential layoff date, Defendant informed its H&BC employees that a severance package would be available to those employees who were involuntarily terminated because of layoffs and who continued their employment with it through the scheduled date for their last day of work, release date, or business completion date.  Def.'s Ex. A-1 ¶ 4; see Def.'s Ex. A-7 at 2, 6, 10 (May 18, 2000, All Employee Meetings/Q&A).  In a February 9, 2000, Project Cortez Key Messages/Q&A, Defendant provided an example of how the severance and retirement plans worked and informed that its People Team and H&BC legal resource were working on the question of whether employees would be offered a voluntary severance pay package.  Pls.' Ex. 2b at 2, ¶¶ 1, 4.  Defendant's "retention plan was approved as submitted" at a Cortez Executive Review Board Meeting on February 15, 2000.  Pls.' Ex. 16 at a, c.  In March 2000, "as a courtesy to its employees," Defendant ensured that job openings at Quatro were posted in common areas of its Bluewater and DAS facilities, and also informed employees orally through supervisors and through a March 29, 2000, Key Message that Quatro would be holding an open house on April 7,

2000.  See Pls.' Ex. 14 at 29-30 (Jean Tamura, management employee, Dep.).

In April 2000, Defendant instituted further retention incentive programs, including additional vacation carryover and exempt overtime; career exploration and development opportunities; tuition reimbursement and paid time off for employee retraining; and, once a business completion date had been assigned an employee, paid time off for job interviews.  See Def.'s Ex. A-7 at 4 (May 18, 2000, All Employee Meeting/Q&A). On May 18, 2000, Defendant introduced its Milestone reward program.  Def.'s Ex. A-7 at 1, 4.  (Employees, however, would not be paid their Milestone bonuses in full until their release or business completion date. Id. at 2; Def's Ex. A at 2 ¶ 8.)  On May 18, 2000, Defendant also reported that its voluntary severance program was not a viable option for Project Cortez.  Def.'s Ex. A-7 at 1, 2, 4.  On June 22, 2000, Defendant reported through an All Employee Meetings/Q&A that two of three Milestone retention incentives would no longer apply, with only the Legacy to Quatro outsource Milestone remaining in effect.  Def.'s Ex. A-13 at 1, 2.  Defendant further reported the retention education reimbursement program would be reviewed and, in the future, the program would focus on careers within the company.  Id. at 2.

The record contains evidence that as early as February 2000, if not before, Defendant's management employees began to have reservations about the Malaysian outsourcing portion of Project Cortez.[5]  On June 21, 2000, Defendant formally scrubbed the Malaysian outsourcing

---

[5]For ease of reference, instead of using Plaintiffs' alphanumeric system for citing to deposition testimony/exhibits (e.g., Pls.' Ex. 19b), the Court will cite directly to the deposition page number (e.g., Pls.' Ex. 19 at 27).  As examples of concerns management level employees had about the Malaysian outsourcing portion of Project Cortez, see the following:  Pls.' Ex. 19 at 27 (Lindeman Dep.); id. at 46-47 (In February and March 2000, concerns existed about Malaysian outsource project.); id. at 57 (management employees had reservations in May 2000 and "for some time" and reported them to Dters and the Executive Commitee); Pls.' Ex. 4 at 31 (Dana Badgerow, Vice President of Global Operations, Dep. -

portion of Project Cortez, including the resulting need for general layoffs.[6]  Consequently,

according to Defendant, employees were never assigned release or business completion dates, laid

off, or awarded severance benefits. Def.'s Ex. A at 3 ¶ 9.  On either or both June 22, 2000 (the

date is disputed), employees were informed of the cancellation of the Malaysian outsourcing plan,

and that there would be no layoffs of the direct labor force.

## B.      Project Cortez - Quatro Outsource

At a January 17, 2000, meeting between Defendant and Quatro, Quatro's purchase of

Defendant's inventory and equipment was discussed, as well as employment possibilities for

Defendant's employees.  Pls.' Ex. 27b-c.  On January 18, 2000, through a Project Cortez All

Employee Meeting/Key Messages/Q&A, Defendant informed its Albuquerque employees about

the Legacy outsourcing portion of Project Cortez, with no mention of a potential outsource

supplier.  Def.'s Ex. A-4.  Cf. Pls.' Ex. 15 at 9.  On February 9, 2000, in a Project Cortez Key

Messages, employees were notified that a recommendation for the Legacy outsourcing had been

made to the Executive Committee, approval was expected shortly, and "[a] preliminary transition

Badgerow had reservations about ITG outsource between December 1999 and February 2000); id. at 32-
33 ("It was apparent to us by [February 17, 2000,] that the savings that were originally envisioned were
not going to be realized in full."); id. at 44 (In April or May, 2000, "the team felt the schedule was in
serious jeopardy."); id. ("I had personal reservations throughout the entire project"); id. at 55 ("We began
to learn [in the first part of 2000] that it wasn't really having that impact . . .").  In late March, April and
May 2000, the reservations grew.  See Pls.' Ex. 6 at 46-47 (Deters Dep.).

[6]According to the record, in June 2000 there were two Project Cortez Executive Review Board
meetings regarding the Malaysian outsource, one on June 8 and another on June 21.  See Pls.' Ex. 4 at 50-
54, 59.  (The first meeting may have concerned the outsourcing of Defendant's final assembly work, as the
decision to keep final assembly work in Albuquerque was made on June 8, 2000, Def.'s Reply (ERISA
claims, (Docket No. 41) at 4.)
        It appears that the secondary supplier referenced in the January 18, 2000, Key Messages/All
Employees Meeting/Q&A, Def.'s Ex. A-4 at 1, 2; Pls.' Ex. 4 at 29 (Badgerow Dep.), was never used and
the recovery plans referenced in the May 18, 2000, All Employees Meeting/Q&A, Def.'s Ex. A-7 at 1, 3, 4
never came to fruition.  Cf. Def.'s Ex. A-12 (June 21, 2000, Cortez Alternatives Comparison).

plan is in place and needs to be reviewed with the supplier." Def.'s Ex. A-8 at 1. Additionally, in response to a question regarding whether HVAC employees at DAS would be moved to Bluewater or if they would be offered the severance pay plan package as soon as their products left, Defendant replied that HVAC direct team members (i.e., non-support team members) at DAS whose products were outsourced would fill open positions and positions currently held by contract workers at Bluewater. Pls.' Ex. 2 at a, b-c ¶ 7 (Feb. 9, 2000, Key Messages-Project Cortez/Q&A).

On February 15, 2000, a Cortez Executive Review Board Meeting was held regarding decisions and actions as to, among other matters, the Legacy outsourcing. Pls.' Ex. 16 at a, c (Feb. 17, 2000, Interoffice Corresp. from Deters to other management employees re: Mins. of Feb. 15, 2000, Cortez Exec. Rev. Bd. Mtg.).[7] On February 16, 2000, a H&BC Project Cortez Team Meeting was held on the topic of "Legacy Outsource Update." The meeting discussion is summarized as: "Quatro approved as a vendor[;] Need to work out details with Legal on developing a win/win on the vendor's need for Honeywell resources." Pls.' Ex. 28. (The record evidences that Honeywell's resources included Defendant's employees.) As of March 8, 2000, the Quatro transition, including the movement of Defendant's employees, needed to be completed

---

[7]The correspondence informed that: "Quatro Corp. was approved as the future supplier for the [L]egacy products. The schedule has been developed with a completion target for the transfer of July 1, 2000 [sic]. Quatro is interested in hiring several Honeywell employees to assist with the technology transfer and the long term-success of the business." Id. at c. Deters, with two other employees, was to "[d]evelop the proper approach to accomplishing this by 2/25/00." Id. (bold-type omitted). It is ambiguous whether February 25, 2000, was the deadline to develop "the proper approach" or the goal for the technology transfer.

by May 30, 2000.[8]  See Pls.' Ex. 6 (Deters Dep.) at 55-56, 57.  During the week of March 8, 2000, Defendant held a meeting with Quatro regarding its job openings and, through a Project Cortez-Key Messages, communicated those openings to Defendant's H&BC team members.  Cf. Def.'s Ex. K at 36; Def.'s Ex. H at 44.  As previously stated, "during the spring of 2000," Defendant also ensured that job openings at Quatro were posted in the common areas of the Bluewater and DAS facilities.  Def.'s Ex. A at 2 ¶ 7.  Additionally, Quatro gave presentations at Honeywell, toured Honeywell, or otherwise "kept coming around."  Def.'s Ex. H at 43; see Def.'s Ex. L at 50-51; Pls.' Ex. 10 at 42-43, 54; Pls.' Ex. 12 at 64; Pls.' Ex. 18 at 46-48.  On March 15, 2000, Defendant reported in a Project Cortez-Key Messages that the decision to outsource the FS-90 Legacy product to Quatro had been finalized and that a "joint review of this project plan was held [sic] Thursday, March 16, between Honeywell H&BC and Quatro Corporation."  Def.'s Ex. A-9.

On May 10, 2000, in a Project Cortez-Key Messages, Defendant reported that with regard to "Legacy," the "front-end move began last week and will continue through the rest of the month[; t]he transfer of H&BC team members from the DAS facility to the Bluewater site" had begun that week, with completion to occur by the end of the first week in July; and "6 team members have left to join the Quatro organization."  Def.'s Ex. A-11.  On June 8, 2000, Defendant's Executive Review Board noted that "Quatro staffing complete - '10' Honeywell employees accepted positions[;] Ex[-]Honeywell individual hired as [D]irector of Materials[;] Fills

---

[8]As of the February 15, 2000, Cortez Executive Review Board Meeting, the completion target date for the transfer was July 1, 2000.  See Pls.' Ex. 16 at a, c. As of April 19, 2000, "[t]he physical move of the front-end process to Quatro begins as scheduled the first week in May."  Def.'s Ex. A-10 (Apr. 19, 2000, Key Messages-Project Cortez).

most key expertise needs." Pls.' Ex. 27d.

There is no evidence in the record that employees were informed that the Quatro portion of Project Cortez necessitated the movement of some of them to Quatro and the ending of their employment with Defendant, including any evidence that Defendant sought voluntary transfers. Although there appears to have been some uncertainty on the issue, in the end, employees were not allowed to work for both Quatro and Defendant.

## C.    Plaintiffs

Plaintiffs were Albuquerque-based regular employees of Defendant.  Plaintiffs were experienced employees, all of whom had been employed with Defendant for at least four years and ten months, and many for much longer.[9]

After more than 19 years with Defendant, Plaintiff Montoya resigned on or around April 13, 2000. [10]  After contemplating employment with Quatro, on April 24, 2000, e.g., Def.'s Ex. J at 49, Plaintiff Montoya began employment with Sennheiser.  Plaintiff Campbell had been an employee of Defendant for over 24 years until her resignation on April 24, 2000. Plaintiff Campbell began work at Quatro on May 30, 2000.  Plaintiff Peralta had been in Defendant's employ for more than 5 years until her resignation in April or May of 2000, depending on each party's version of the facts. After approximately 8 years in Defendant's employ, Plaintiff Fishel resigned from Honeywell some time in the beginning of May, and began work for Quatro on May

---

[9]The Court relied upon Plaintiffs' complaints, Defendant's answers, and the parties' exhibits to calculate Plaintiffs' approximate length of service. A Plaintiff's "resignation" date may not be equivalent to her or his "last day."

[10] For some Plaintiffs, the evidence conflicts or is unclear as to when he or she resigned, when her or his "last day" was, and/or when he or she began work for Quatro.

21 or 22, 2000.  Def.'s Supp. Mem. (ERISA Claims, Doc. No. 38) at 7 ¶ 14 (State. Undisp. Mat. Facts) (citing Def.'s Ex. E at 61).  But see Def.'s Ex. O (began work with Quatro May 8, 2000); Pls.' Ex. 3b (began work with Quatro May 30, 2000).

Plaintiff Vargas had been an employee of Defendant for almost 5 years at the time of his resignation on or before May 5, 2000. Plaintiff Bautista had been an employee of Defendant for approximately 12.5 years until her resignation sometime after early May 2000. There is evidence that Plaintiff Bautista's last day was May 15, 2000, Def.'s Ex. B at 92, or May 19, 2000, id.; Pls.' Ex. 3c.  Plaintiff Bautista testified she was separated earlier than previously arranged.  Def.'s Ex. B at 83-84. Cf. Def.'s Ex. B at 92.  On May 22, 2000, after a call from Dolores Hoke on May 19, Plaintiff Bautista began employment with Quatro.  E.g., Def.'s Supp. Mem. (ERISA Claims, Doc. No. 38) at 8 ¶ 19 (State. Undisp. Mat. Facts) (citing Def.'s Ex. B at 75).

Plaintiff Wood had been employed with Defendant for almost 11 years at the time of her resignation on May 19, 2000.  After a call from Dolores Hoke of Quatro, Plaintiff Wood began work for Quatro earlier than agreed, in the afternoon of the same day she resigned, May 19, 2000. Def.'s Ex. K at 47-48; see Def.'s Supp. Mem. (ERISA Claims, Doc. No. 38) at 7 ¶ 15 (State. Undisp. Mat. Facts) ("She went to work for Quatro the same day.") (citing Def.'s Ex. K at 48). But see Pls.' Ex. 3b (Plaintiff Wood resigned June 2, 2000, and started at Quatro on June 5, 2000).

Plaintiff Garcia had been employed by Defendant for approximately 8 years upon her resignation on May 25, 2000, Def.'s Supp. Mem. She began work with Quatro one day later, on May 26, 2000.  Id.  There is other evidence that Plaintiff Garcia's last day with Defendant was May 26, 2000, and her first day with Quatro was May 30, 2000.  Pls.' Ex. 3c. Plaintiff Medina

had been an employee of Defendant for almost 8 years upon his resignation on June 7, 2000.  He

began employment with Quatro on June 19, 2000.  Id. (citing Def.'s Ex. G at 55).  Plaintiff

Candelaria had been employed for 7 years upon his resignation on May 25, 2000, effective June 9,

2000.  He began work for Quatro on June 12, 2000.  Pls.' Ex. 3b; Def.'s Ex. Q.  Cf. Def.'s Supp.

Mem. (ERISA Claims, Doc. No. 38) at 8 ¶ 18 (State. Undisp. Mat. Facts) (Plaintiff Candelaria

went to work for Quatro "in June.").

 As of May 30, 2000, Plaintiff Torres' last day with Defendant and start date with Quatro

was "TBD."  Pls.' Ex. 3c.  In late April or early May 2000, Plaintiff Torres was requested by

Dolores Hoke of Quatro to drop off his resume.  Def.'s Supp. Mem. (ERISA Claims, Doc. No.

38) at 9 ¶ 21 (State. Undisp. Mat. Facts).  On May 30, 2000, Plaintiff Torres began work at

Quatro while continuing to work for Defendant.  Id.  Although management employee Charlie

Steele saw no problem with dual employment with Quatro, see Def.'s Ex. K at 69; Def.'s Ex. B at

70, on June 16, 2000, "COE Leader," Steve Calvert, informed Plaintiff Torres that it was an

ethics code violation for him to work for both it and another employer.  Calvert told Torres that he

had to choose between it and Quatro in a written decision, by 3:00 p.m. on June 19, 2000.[11]   In a

June 19, 2000, letter, Plaintiff Torres informed Defendant that he had "decided to keep [his]

current position at Honeywell, Inc."  Def.'s Ex. T.  When Plaintiff Torres was asked by Calvert

---

[11]Def.'s Ex. R. Cf. Def.'s Supp. Mem. (ERISA Claims, Doc. No. 38) at 9 ¶ 21 (State. Undisp. Mat. Facts) (Plaintiff told "that he needed to choose one of the two employers.") (citing Def.'s Ex. R). During his exit interview, held before June 16, 2000, Plaintiff Torres told Mary Scott that contrary to her statement, he was not leaving voluntarily. Def.'s Ex. L at 58. According to Plaintiff Torres, Scott said "that she would have to get with [HR at] corporate headquarters, to see if I could stay working at both jobs." Id. at 58. Cf. Pls.' Ex. 29 at 33 (In response to employee questions, Scott called "Honeywell's legal department" and was told that Quatro was "considered a subcontractor of Honeywell" and employees "cannot work for both.").

and Scott, on or about June 20, 2000, to clarify his written response, Def.'s Ex. L at 61, Plaintiff

Torres informed that he intended on keeping both jobs, Def.'s Ex. L at 61-62.  On or about June

20, 2000, Defendant terminated Plaintiff Torres for violating its ethics code. [12]  Def.'s Supp.

Mem. (ERISA Claims, Doc. No. 38) at 9 ¶ 21 (State. Undisp. Mat. Facts); Def.'s Ex. L at 61. Cf.

Def.'s Ex. R.  At the time of his termination, Plaintiff Torres had been employed with Defendant

for more than 7 years.

All Plaintiffs, with the exception of Plaintiff Montoya, ended their employment with

Defendant for employment with Quatro.  Although muddled, there is evidence that eight of the

eleven Plaintiffs began working for Quatro on or before May 30, 2000, and two Plaintiffs began

employment with Quatro in June 2000.  Plaintiffs testified they resigned or, in the case of Plaintiff

Torres, worked at Quatro in violation of Defendant's ethics code, because they believed the

comments made to them by Defendant's management employees that their positions were being

eliminated and/or that it was in their best interest to join Quatro's employ.

## II.    LEGAL STANDARD

Two of Defendant's motions are for partial summary judgment.  Defendant's third motion,

concerning Plaintiffs' common law claims, seeks partial dismissal or, alternatively, partial

summary judgment. [13]  Because Defendant relies upon evidentiary materials outside the

---

[12]In his June 16, 2000, letter management employee Steve Calvert informed Plaintiff Torres that a failure to respond by the June 19 deadline would be considered "as a voluntary resignation" of his employment with Honeywell. Def.'s Ex. R.

[13]Notwithstanding the title of its third motion, Defendant contends that "the Court need not convert" its motion to dismiss to one for summary judgment.  Def.'s Supp. Mem. (State Law Claims, Doc. No. 43) at 12. (Defendant's argument is a duplicate of the one it presented to Judge Black in Campbell v. Honeywell. Def.'s Supp. Mem. (01cv86, Doc. No. 6) at 3-4.) In support of its contention, Defendant contends that a motion to dismiss need not be converted to a motion for summary judgment if a plaintiff

complaints, the Court will treat Defendant's state law motion as one for summary judgment. Fed. R. Civ. P. 12(b).

Pursuant to a summary judgment standard of review, the truthfulness of the factual allegations will not be presumed and the Court will consider extrinsic evidence in reaching its conclusions. The motions will be granted only if there is no genuine issue of material fact and, as a matter of law, the moving party is entitled to judgment. Fed. R. Civ. P. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 249, 251-52, 255 (1986). The evidence will be construed in the light most favorable to the nonmovant, Magnum Foods, Inc. v. Continental Casualty Co., 36 F.3d 1491, 1497 (10th Cir. 1994), and all doubts and factual inferences must be resolved in favor of the existence of triable issues of fact. See Seamons v. Snow, 206 F.3d 1021, 1026 (10th Cir. 2000); World of Sleep, Inc. v. La-Z-Boy Chair Co., 756 F.2d 1467, 1474 (10th Cir. 1985); see also Anderson, 477 U.S. at 255 (When determining whether a genuine issue of material fact exists, all "justifiable inferences" are drawn in favor of the non-moving party. (emphasis added)); Magnum, 36 F.3d at 1497 ("We . . . draw any inferences in the light most favorable to the party opposing summary judgment." (emphasis added)). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Only then does the burden shift to the nonmovant to come forward with

had notice of the documents referred to by the movant and relied upon the documents in framing her or his complaint. Def.'s Supp. Mem. (State Law Claims, Doc. No. 43) at ll (citations omitted). This may be true, as a matter of law, but Defendant's next supporting allegation, that "the 'severance package' set forth in the Severance Pay Plan is integral and central to Plaintiffs' claim," id., is, at best, inaccurate. See, e.g., Campbell v. Honeywell, No. Civ. 01-86 BB/LFG. Doc. No. 15 at 3 (filed Jan. 3, 2002) (allowing for possibility that Plaintiff's Campbell's state law claims could be based on promises and misrepresentations other than those arising from Defendant's severance package). Consequently, Defendant's argument that its motion to dismiss not be construed alternatively as a motion for summary judgment is based on a faulty assumption and is without merit.

evidence showing that there is a genuine issue of material fact.  See Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).

## III.   PRELIMINARY ISSUES

Although with great unease, in the interest of justice, the Court has exercised its discretion to closely examine, and at times comb, the record.  Cf., e.g., Carillo v.  New Mexico, 00cv1087 JP/RLP-ACE, (D. N.M., July 26, 2001) slip op. at 4 (Doc. No. 73).  The persuasiveness of the parties' briefs is undercut by sloppiness and, on Plaintiffs' part, lack of attention to detail, nonclarity, and overly broad argument, and on Defendant's part, snide remarks and a narrow, shotgun approach to argument.  The Court's job was further complicated by the parties' failure to explain the context of Project Cortex and to tab or, at a minimum, index, the stack of exhibits each of them submitted.

The intended scope of Project Cortez, while defined by Plaintiffs' counsel, is not explicitly supported by counsels' reference to the record.  Plaintiffs' counsel uses the term "Project Cortez" to encompass both the Malaysian outsource and the Quatro outsource.  See, e.g., Pls.' Resp. (State Law Claims, Doc. No. 45) at 2 ("Project Cortez eventually developed  two branches, which will be referred to here as the Legacy and Board branches."). As for Defendant's counsel, the ambit of "Project Cortez" fluctuates. Oftentimes, Defendant's counsels' use of the term "Project Cortez" includes only the Malaysian outsourcing – especially when it benefits Defendant's argument.  Occasionally, the term is used by Defendant's counsel to include both the Malaysian and the Quatro outsourcing.[14]  After scrutinizing the record, the Court concludes that

_____

[14] Although the record is less than informative, it appears that Defendant's original plan may have been to outsource to Asia both its Board work and its Legacy products, but, after investigation and reconsideration, Defendant decided to outsource only its Board work to Malaysia and outsource its Legacy

by 2000, if not earlier, "Project Cortez" consisted of two portions – (1) the ITG Malaysian

outsourcing of Board work (manufactured at Defendant's Albuquerque Bluewater facility), which

was canceled before being implemented, and (2) the Quatro outsourcing of Legacy product(s)

(manufactured in leased space at Defendant's Albuquerque DAS facility), which was

implemented.[15]

     The scope of Project Cortez is relevant because the underlying assumption of many of

Defendant's arguments is that Project Cortez consisted of only the Malaysian outsource.

---

product to a national or local company. This modification of Defendant's plan(s), might explain the
confusion in terminology.

[15]Def.'s Ex. A at 2 ¶¶ 6, 9 (Kline Aff.); see Pls.' Ex. 4 at 33 (Badgerow Dep.) ("Q. Did you have
anything to do with the outsourcing of the Legacy product to Quatro?  A. Only insomuch as I had oversight
of the entire Project Cortez. So the outsourcing to Quatro was also a part of that project."); Def.'s Supp.
Mem. (ERISA Claims; Doc. No. 38) at 2-3 ¶ 4 (State. Undisp. Mat. Facts) ("Specifically, Project Cortez
called for out-sourcing to Malaysia the manufacture of [Boards] . . . and for outsourcing to [Quatro] the
manufacture of H&BC's 'Legacy' line of products. . . .") (citing Def.'s Ex. A at 2 ¶ 6); Def.'s Supp. Mem.
(Discrim. Claims; Doc. No. 34) at 3 ¶ 2 (same); Pls.' Ex. 16 at a-c (Feb. 17, 2000, Interoffice Corresp. re:
Mins. of Feb. 15, 2000, Cortez Exec. Rev. Bd. Mtg., with decisions and management employee
assignments/"actions" for "Board Outsourcing to ITG" and for "Legacy Product Outsourcing"); Pls.' Ex.
27a (document entitled "Legacy Products Outsource[,] Cortez Project"); (Consol.) Pretrial Order (Doc.
No. 51) at 3 ("Defendant's defenses: Honeywell undertook 'Project Cortez' in 1999 in order to reduce the
production costs associated with its printed wire board assemblies. The project called for outsourcing the
production of the assemblies to Quatro, a local company, and [to] ITG, a Malaysian company."); Def.'s
Supp. Mem. (State Law Claims, Doc. No. 43) at 6 ¶ 10 (State. Undisp. Mat. Facts) ("H&BC analysts had
estimated in 1999 that the company could realize a substantial savings by transferring the manufacture of
[Boards] to an Asian contractor and by outsourcing the manufacture of the Legacy products.") (citing
Def.'s Ex. A at 3 ¶ 9); Def.'s Supp. Mem. (Campbell motion, 01cv86, Doc. No. 6) at 1 ("In the end,
Honeywell elected not to proceed with the entire out-sourcing plan . . . ."). But see Def.'s Supp. Mem.
(State Law Claims, Doc. No. 43) at 6 ¶ 10 (State. Undisp. Mat. Facts) ("On June 21, 2000, the Executive
Review Board met to consider Project Cortez and concluded that it should be discontinued. Consequently,
for this business reason, Project Cortez was cancelled [sic] at that time (although the outsource of Legacy
products to Quatro was left in place.")) (citing Def.'s Ex. A at 3 ¶ 9); (Consol.) Pretrial Order ( Doc. No.
51) at 5 (Stip. Fact. Contens.) ("In 1999, Defendant undertook a study regarding possible outsourcing of
the production of its printed wire board assemblies. The undertaking was called 'Project Cortez.'  Incident
to Project Cortez, Defendant outsourced its Legacy products to Quatro during the first half of 2000.");
Pls.' Ex. 6 at 57 (Deters Dep.) ("The date at which we moved the Legacy products was -- the plan and
everything was totally separate from the ITG plan, just for a point of clarification." [sic]).

18

However, Defendant's arguments fail to acknowledge the existence of facts surrounding the

Quatro outsource.[16]

Notwithstanding Defendant's counsels' arguments to the contrary, the Quatro outsourcing

subpart of Project Cortez is material. It is relevant not only because it was a success (unlike the

abandoned Malaysian subpart), but also because (1) its success was predicated on ensuring

---

[16]   See, e.g., Def.'s Supp. Mem. (State Law Claims, Doc. No. 43) at 2; Def.'s Reply (ERISA Claims, Doc. No. 41) at 8 (To survive the ERISA motion for summary judgment, Plaintiffs must "demonstrate that the reasons Honeywell gives for initiating, implementing, and then canceling Project Cortez were false."). See, e.g., Def.'s Supp. Mem. (ERISA Claims, Doc. No. 38) at 1 ("This case arises out of Honeywell's business decisions first to undertake Project Cortez, and then to cancel it."); Def.'s Supp. Mem. (State Law Claims, Doc. No. 43) at 6-7, ¶ 10 (State. Undisp. Mat. Facts) (Defendant did not layoff employees or provide release dates or severance pay because Project Cortez was canceled.) (citing Def.'s Ex. A at 2, ¶ 9); id. at 1 ("In the end, however, Honeywell elected not to proceed with the entire out-sourcing plan and no layoffs occurred. When Honeywell made this decision to cancel Project Cortez, immediately" informed its employees that no layoffs would result.); id. at 20 ("Plaintiffs would have Honeywell keep its workforce in the dark until a final decision was made to layoff workers under Project Cortez. This is hardly a desirable standard of care."); id. at 2 ("Honeywell strongly denies that any employees were induced or tricked into leaving Honeywell and that Project Cortez was a sham.  The notion that Honeywell spent thousands of dollars and hundreds of hours manufacturing an elaborate out-sourcing plan simply to cause a few employees to leave is absurd. The result which Plaintiffs would encourage – to keep employees in the dark when job cuts are considered – is just as absurd.").

A further, albeit lengthier, example of Defendant's counsels' fickle stance regarding the scope of Project Cortez and of counsels' use of a narrow definition of Project Cortez to support an argument, is:

Simply put, Project Cortez was intended to save money. Unfortunately for Honeywell, the project failed. Honeywell therefore cancelled [sic] Project Cortez to cut its losses. Specifically, Honeywell analysts in 1999 estimated that the company could realize a substantial savings by transferring [i.e., outsourcing] the manufacture of [Boards] to a contractor in Asia and by outsourcing the manufacture of Legacy products to Quatro.  By mid-June 2000, however, assessments of Project Cortez revealed that Honeywell had underestimated the costs of manufacturing products in Malaysia. The Executive Review Board met on June 21, 2000, to decide how to proceed and concluded . . . to cancel Project Cortez, although the outsource of Legacy Products was left in place. . . .  Th[e] notion[] that Honeywell would concoct an expensive ruse to send jobs to Asia, actually begin to implement it, and then cancel it, all in an effort to avoid providing its employees with ERISA-covered benefits[ ] is as absurd as it is false.

Def.'s Supp. Mem. (State Law Claims, Doc. No. 38) at 15 (citations omitted).

Quatro's expertise needs were met by the permanent and timely transfer of human resources from Defendant to Quatro; (2) all but one Plaintiff left employment with Defendant for employment at Quatro during Project Cortez (specifically, between May and mid-June 2000); (3) Plaintiffs allege that during Project Cortez, Defendant pushed them to seek employment with Quatro, relying on fear about layoffs resulting from the Malaysian Board outsourcing and the purported closing of Defendant; and (4) there is no evidence that Defendant disclosed the human resource transfer element of the Quatro outsource to its employees.[17]

## IV.   DISCUSSION

### A.   Race and Age Discrimination Claims

Defendant seeks summary judgment as to the claims of Plaintiffs Bautista and Campbell in Count I of their separate first amended complaints for race discrimination under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.  Defendant also seeks summary judgment as to the claim in Count II of the <u>Garcia</u> complaint for race discrimination under 42 U.S.C. § 1981 made by six of the nine <u>Garcia</u> Plaintiffs.  Defendant further seeks summary judgment as to

---

[17] While explicitly alleging that Defendant was not above-board with them about the evolving status of the Malaysian part of Project Cortez, Plaintiffs' arguments about Defendant's actions, or nonaction, regarding the Quatro part of Project Cortez, are more implicit but logically flow from their Malaysian arguments. <u>See</u>, <u>e.g.</u>, Pls.' Resp. (ERISA Claims, Doc. No. 40) at 2 ("It is the status of the Malaysia outsourcing debacle, and what Defendant knew but did not tell its employees about that, coupled with its devices and desires to move Plaintiffs over to Quatro, that underlies [sic] this case."); Pls.' Resp. (State Law Claims, Doc. No. 45) at 18-19 ("Defendant promised [to provide Quatro with] employees and when 10 employees took the bait, Defendant wrote the 'Quatro staffing was complete.' So was Defendant's plan."); <u>id.</u> at 13 (Plaintiffs' state law claims "have nothing to do with the severance plan, but rather with Defendant's desire to induce certain employees to go to Quatro and therefore to keep them in the dark about the true situation in Malaysia . . . ."); Pls.' Resp. (ERISA Claims, Doc. No. 40) at 9 ¶ 10 ("[I]t was important to both Honeywell and Quatro for Quatro to get about 10 people; and those people needed to be gone with the product by May 30, 2000."); <u>id.</u> at 14 ("Defendant's conduct of deceiving and manipulating Plaintiffs into departing for Quatro"); Pls.' Resp. (State Law Claims, Doc. No. 45) at 4 ¶ 9.

Plaintiff Campbell's claim in Count VII of her first amended complaint for age discrimination under the ADEA and, assuming properly alleged, the New Mexico Human Rights Act.  In their response, Plaintiffs concur in Defendant's motion for summary judgment, "as to the relief requested only." Pls.' Resp. (Discrim. Claims, Doc. No. 35) at 1.  Accordingly, Defendant's motion for summary judgment on Plaintiffs' race and age discrimination claims under federal and/or state laws will be granted.

**B.     ERISA Claims**

Defendant contends, in short, that Plaintiffs' claims for ERISA interference are precluded because Plaintiff Torres was legitimately terminated for a rule violation and the remaining Plaintiffs voluntarily resigned.  Thus, Defendant concludes, "the decisions surrounding Plaintiff Torres' departure, as well as those with respect to Project Cortez, were all made for legitimate, non-discriminatory reasons, unrelated to ERISA-covered benefits."  Def.'s Supp. Mem. (ERISA Claims, Doc. No. 38) at 2; see id. at 16.  Plaintiffs argue that they were constructively discharged and/or, in the case of Plaintiff Torres, pretextually terminated, purposely interfering with their rights to continue benefits covered under ERISA, including health, retirement, and pension benefits.  Plaintiffs further contend that Defendant intentionally interfered with their ERISA-protected right to severance pay.  In its reply, Defendant more directly contends that (1) Plaintiffs were not constructively discharged, (2) it lacked the requisite specific intent, and (3) there is no evidence of pretext on its part.

It is uncontested that the employee benefit plans at issue are covered by ERISA and that Plaintiffs were plan participants while employees of Defendant.  Plaintiffs fail to indicate in their complaints which section of ERISA Defendant allegedly violated, but Plaintiffs do not contest

Defendant's argument that their ERISA claims are pursuant to ERISA § 510, codified at 29 U.S.C. § 1140.

ERISA § 510 precludes an employer from (1) discharging, disciplining, suspending, expelling, fining, or otherwise discriminating against a plan participant (2) for the purpose of interfering with her or his rights under the plan, including "the attainment of any right to which such participant may become entitled under the plan. . . ." 29 U.S.C. § 1140.  To prevail under § 510, a plaintiff must demonstrate not only that he or she was subject to employer conduct falling within § 510's definition of unlawful acts but he or she also must demonstrate, through direct or indirect proof, that the employer had the specific intent to interfere with her or his ERISA protected benefits.  See, e.g., Garratt v. Walker, 164 F.3d 1249, 1256 (10th Cir. 1998) (rehearing en banc); Winkel v. Kennecott Holdings Corp., 3 Fed.Appx. 697, 706, 2001 WL 23163 at *7 (10th Cir., Jan. 10, 2001) (unpublished disposition).  In meeting the intent element, a plaintiff  "is not required to show that the employer's sole motivation was to interfere with employee benefits, [but only] that it was a motivating factor." Garratt, 164 F.3d at 1256. However, the plaintiff must show that loss of benefits was more than an incidental loss.  Daughtrey v. Honeywell, Inc., 3 F.3d 1488, 1492 (11th Cir. 1993) ("[M]easures designed to reduce costs in general that also result in an incidental reduction in benefit expenses do not suggest discriminatory intent.  Instead, the employee must introduce evidence suggesting that the employer's decision was directed at ERISA rights in particular." (internal quotations omitted and alteration in Daughtrey)).

Plaintiffs do not contest Defendant's assertion that the McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), three-pronged burden-shifting method used in discrimination cases applies also to § 510 claims involving circumstantial proof of intent.  Under

the McDonnell Douglas approach, a plaintiff first must make a prima facie case that the defendant through its conduct intended to interfere with her or his ERISA-protected employee benefits.  If accomplished by the plaintiff, the defendant must articulate a legitimate, nondiscriminatory reason for its action. ("The defendant's burden at the second stage of the McDonnell Douglas analysis is one of production, not persuasion." Winkel, 3 Fed.Appx. at 706, 2001 WL 23163 at 8.)  Finally, if this step is met, the plaintiff must produce evidence indicating that the defendant's proffered reason is pretextual.

Defendant contends that it did not take any actions prohibited by § 510 because Plaintiffs were not constructively discharged and/or pretextually terminated.  Defendant further argues that Plaintiffs were unreasonable for leaving – that they had only their own expectations that they would be laid off and that a reasonable person would have seen that other choices besides resigning existed.  Defendant argues that "a recovery by Plaintiffs in these circumstances would discourage employers from forthrightly and timely disclosing possible layoffs. Honeywell should not be penalized for acting in a manner which the law should encourage." Def.'s Supp. Mem. (ERISA Claims, Doc. No. 38) at 13.  In reference to Plaintiff Torres specifically, Defendant contends that its decision to terminate him was for legitimate, nondiscriminatory business reasons.

**1.      ITG**

Plaintiffs fail to make a prima facie case that the Malaysian portion of Project Cortez, in and of itself, constitutes a violation of § 510.  Assuming that Plaintiffs meet the first requirement of § 510 (covered employer action), they fail to establish that Defendant specifically intended to interfere with their ERISA-protected employee benefits through the Malaysian outsourcing project, in and of itself.  Defendant contends that its intent in pursuing the Malaysian outsourcing

portion of Project Cortez was to "save money."  Def.'s Supp. Mem. (ERISA Claims, Doc. No.
38) at 15.  The record supports Defendant's contention.  See, e.g., Def.'s Exs. A-1 - A-3
(decision to outsource Board work was part of initiative to increase competitiveness and reduce
costs); Pls.' Ex. 4 at 36  (Badgerow Dep.) (for Malaysian portion of Project Cortez, "the largest
single element of savings was in labor").  The record does not support the inferential conclusion
that by reducing labor costs through the Malaysian outsourcing project, in and of itself, Defendant
specifically sought or intended to interfere with its employees' ERISA benefits.[18]  See Daughtrey,
3 F.3d at 1491, 1492 (The desire to cut costs or reduce employees, by itself, is insufficient to
demonstrate more than an incidental effect, i.e., a specific intent, to interfere with an employee's
attainment of ERISA benefits.).  Therefore, as a matter of law, there are no material facts in
dispute and there is insufficient evidence of the necessary § 510 employer intent as to the
Malaysian portion of Project Cortez, in and of itself.  Alternatively, even assuming Plaintiffs have
established a prima facie case, in response to Defendant's articulation (and evidence) of a
legitimate reason, Plaintiffs fail to demonstrate pretext on the part of Defendant.  Cf. Humes v.
McDonnell Douglas, Corp., 922 F.Supp. 229, 235 (E.D. Mo. 1996) ("Alternatively, assuming
plaintiff made a prima facie showing on the issue of intent, defendant is still entitled to summary
judgment because defendant has articulated legitimate business reasons for terminating plaintiff.").
Therefore, where based solely on the Malaysian outsourcing, Plaintiff's ERISA claims against
Defendant fail.  Summary Judgment will be granted as to those claims.

---

[18] In fact, if successful, the Malaysian plan would have resulted in severance pay expenses for
Defendant.  See Pls.' Ex. 4 at 56 (Badgerow Dep.) ("[Q. What does the Severance and Pension line mean?]
A. That would be the amount of severance that would have been owed to employees adversely affected by
the complete [Board] outsourcing.").

2.     **Quatro**

The Quatro portion of Project Cortez, especially in combination with and in the context of the Malaysian portion, is another matter.  Plaintiffs have made a prima facie § 510 case.  Further, as to the § 510 intent element, Defendant has not articulated a legitimate, nondiscriminatory reason for its action(s).

As to the first § 510 element (improper employer conduct), Defendant contends that it did not take any actions in violation of § 510 and for Plaintiffs to prove "constructive discharge," they must show facts sufficient to demonstrate under an objective test "that a reasonable person would see no other choice but to quit." Def.'s Supp. Mem. (ERISA Claims, Doc. No. 38) at 12.  Defendant further argues that Plaintiffs voluntarily resigned (and/or, the Court assumes, essentially made a voluntary employment choice which resulted in an involuntary separation)[19]; Plaintiffs' decisions were unreasonable, given the incentives to stay; and Plaintiffs' choice to leave Defendant's employment "was his or her own." Id. at 13. "If Plaintiffs resign of their own free will, 'even as a result of the employer's actions, the employee will not be held to have been constructively discharged.'" Id. at 12 (quoting Jeffries v. Kan. Dep't of Soc.& Rehab. Servs., 147 F.3d 1220, 1233 (10th Cir. 1998)).

Viewing the constructive discharge case law in its totality, Plaintiffs meet the first requirement of § 510.  A court may find a resignation to be involuntary if induced by an employee's reasonable reliance upon an employer's misrepresentation of a material fact, including

---

[19] The parties do not explicitly differentiate Plaintiff Torres' involuntary separation from the resignations of the other Plaintiffs in terms of their "constructive discharge" analysis.  Plaintiff Torres' termination is, in a sense, factually not very different from the resignations. Cf. Def.'s Ex. R. Therefore, the Court has applied a constructive discharge analysis to all Plaintiffs.

the withholding of information, relating to the resignation.  See Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 174 (4th Cir. 1988) (employer's conduct prevented employee "from making a free and informed choice" and resulted in involuntary resignation); Covington v. Dep't of Health and Human Servs., 750 F.2d 937, 942, 943 (Fed. Cir. 1984) ("[W]hether the employee made an informed choice is the touchstone of our analysis. . . .  A decision made 'with blinders on,' based on misinformation or a lack of information, cannot be binding as a matter of fundamental fairness. . . ."); Scharf v. Dep't of the Air Force, 710 F.2d 1572, 1574 (Fed. Cir. 1983) ("[A] resignation will be held involuntary if obtained by [employer] misrepresentation or deception.").  In deciding whether an employee resigned voluntarily or was constructively discharged, a court must look at the totality of the circumstances under an objective standard, including whether the employee understood the nature of the choice he or she was given and whether misinformation induced the resignation.  Spagnola v. State Bd. of Agric.,13 Fed.Appx. 870, 872-73, 2001 WL 791901 at *2 (10th Cir., July 13, 2001) (unpublished disposition); see Stone, 855 F.2d at 174 (A court should look to "the circumstances of the resignation to determine whether the employee was denied the opportunity to make a free choice.");  Scharf, 710 F.2d at 1574 (To determine voluntariness of employee's resignation, a court must examine the surrounding circumstances to test the employee's ability to exercise free choice.).  An employee is not required to show an intent to deceive or mislead on the part of her or his employer for an employee's resignation to be held involuntary.  See Scharf, 710 F.2d at 1574.  "Rather, it is sufficient if the employee shows that a reasonable person would have been misled" or deceived. Id. at 1575.  Cf. Covington, 750 F.2d at 942 ("The misleading information can be negligently or even innocently provided; if the employee materially relies on the misinformation to his detriment, his retirement is considered

26

involuntary.").

There is sufficient support in the record that Defendant constructively discharged and/or pretextually terminated Plaintiffs.  Unlike the facts in the cases cited for support by Defendant, cf. Spagnola, 13 Fed.Appx. at 873, 2001 WL 791901 at *2 (in reverse situation, distinguishing cases where "misinformation caused the resignations"), the trier of fact could conclude that Defendant kept Plaintiffs in the dark regarding material facts, facts that would have informed a reasonable person's decision whether or not to leave Defendant's employ.  The evidence shows that the Quatro transition included the movement of Defendant's employees to Quatro, which needed to be completed by May 30, 2000.[20]

There is no evidence that, to meet the Quatro staffing requirement, Defendant disclosed to Plaintiffs, or its non-managerial workforce generally, the staffing ("human resource" transfer)

---

[20] There is evidence that Defendant sought the movement of its employees not only to ensure the success of the Quatro outsource through the transfer of human expertise, but also to decrease its workforce. Pls.' Ex. 27c (A plus for the selection of Quatro as a Legacy outsource vendor was that the "[l]ikely hood [sic] of Quatro employing some Honeywell Albuquerque personnel [was] very good (5 to 9 people)."). In fact, not only was Quatro open or willing to employ Defendant's employees, but it needed to employ them – allowing Defendant to decrease its workforce without laying off employees.
See Pls.' Ex. 16 at c ("Quatro is interested in hiring several Honeywell employees to assist with the technology transfer and the long-term success of the business."); Pls.' Ex. 6 at 50 (Deters Dep.) ("Q.  If you weren't at [the January 17, 2000, meeting with Quatro], were you at any other meeting with Quatro regarding taking on employment possibility [sic] of Honeywell employees?  A. Yes, I was. After I came on board and the decision was made to put them in Quatro, yes.") (emphasis added); Pls.' Ex. 6 at 55-56 ("Q. So, if the product had to be moved by [May 30, 2000], then the Honeywell employees who were going to go to Quatro would have had to have been moved by that time, have gone to Quatro by that time; is that correct? A. . . . It wouldn't necessarily be an exact date, but it would be very close to that."); Pls.' Ex. 27d (On June 8, 2000, Defendant's Executive Review Board noted that the Quatro staffing was complete: ten Honeywell employees accepted positions at Quatro, including an ex-Honeywell employee hired as Quatro Director of Materials, and filling most key expertise needs at Quatro.). Cf. Pl.'s Ex. 27 b-c (At the January 17, 2000, meeting between Defendant and Quatro, not only was Quatro's purchase of Defendant's inventory and equipment discussed, but also employment possibilities for Defendant's employees.).

aspect of the Quatro outsource project.[21]  Defendant articulates no reason, business or otherwise, for its lack of forthrightness and the Court is unable to infer any legitimate business reason from the evidence on record.

Plaintiffs contend they left their employment with Defendant based upon misinformation and "false pretenses."  See, e.g., Def.'s Ex. K at 69, 51; Pls.' Ex. 10 at 57.  Plaintiffs testified that they did not want to leave their employment with Defendant and that they felt pushed out by Defendant, misled, and/or pressured to leave for Quatro.[22]  Although disputed, Plaintiffs testified that they were told by Defendant's management employees that it would be better if they left; that it would be in their best interest if they applied at Quatro; to look for other employment because things did not look good; that their positions were being eliminated under Project Cortez and if they found another job, to take it; and/or otherwise encouraged them to go to Quatro.  See, e.g., Def.'s Ex. K at 45, 50-51; Pls.' Ex. 12 at 66-69; Def.'s Ex. C at 57-58; Pls. Ex. 24 at 31; Def.'s Ex. H at 49-50; Def.'s Ex. I at 39-40, 56;[23]  Cf. Def.'s Ex. L at 49-50.  There is some evidence

_____

[21] While "Legal" may have devised, on or about February 16, 2000, a "win[-]win" situation for Defendant and Quatro regarding Quatro's needs for Defendant's human resources, Pls.' Ex. 28, the record does not evidence that Defendant's employees were included in the "win-win" equation nor in the "proper approach" developed by Deters, et al., after the February 15, 2000, Cortez Executive Review Board meeting, to aid Quatro in hiring Honeywell employees, Pls.' Ex. 16 at c.

[22] See, e.g., Def.'s Ex. C at 57; Def.'s Ex. K at 49; Def.'s Ex. D at 57; Pls.' Ex. 8 at 53-56; Pls.' Ex. 24 at 57.  Cf. Def.'s Ex. B at 97, 98-99.  But see Def.'s Supp. Mem. (State Law Claims, Doc. No. 43) at 22 ("[T]he only evidence on point shows that Honeywell actually wanted Plaintiffs to stay until the outsourcing was complete and that Honeywell offered inducements or incentives to keep them.") (citing Undisputed Material Fact No. 6) Defendant's Statement of Undisputed Material Fact No. 6 concerns Defendant's severance plan. Def.'s Supp. Mem. (State Law Claims, Doc. No. 43) at 4. The Court assumes that Defendant intended to cite also Fact No. 9 (citing Def.'s Exs. A and A-7), which concerns its retention incentives. Id.

[23] To facilitate ease of reading, rather than providing in the text exemplar quotations of Plaintiffs' supporting testimony, the quotations follow. Plaintiff Bautista testified that, in addition to telling her Quatro was a good company to work for, management employee Jean Tamura, "would stop by and talk

that Plaintiffs were targeted for shifting to Quatro because they possessed experience or expertise

needed by Quatro.  See, e.g. Def.'s Ex. K at 49-51, 71; Pls.' Ex. 8 at 55; Def.'s Ex. I at 39-40;

Def.'s Ex. C at 59.  Some Plaintiffs testified they were asked specifically by management

employees if they had applied with Quatro. See, e.g., Pls.' Ex. 12 at 68; Def.'s Ex. C at 57.

Additionally, there is evidence that Quatro sought out applications from some of the Plaintiffs.

See, e.g., Def's Ex. L at 49-51; Def.'s Ex. I at 39-40.[24]

---

with me [when she was at DAS] and ask me if I had already put in my resume at Quatro, or my
application." Pls.' Ex. 12 at 68.  Plaintiff Bautista testified further that when she spoke with Steve Calvert,
"about putting in an application to Quatro, he told me that it would be a good move for me, because
Honeywell was going away." Id. at 69. Plaintiff Campbell testified she based her decision to go to Quatro
on the statements of her supervisor, Jean Tamura, that "I really think you should apply, and I really think it
would be to your best interests if you would go, and I think that you would be needed at Quatro."  Def.'s
Ex. C at 58. "I went to Quatro because basically I was pushed to go to Quatro. . . .  I had not even thought
about applying for one of those positions, and I was called and asked had I applied, and I told them, 'No,'
and they said, 'Are you going to apply?' I told them 'No.' And [Tamura] said 'I believe it would be to your
best interests if you did apply.'" Id. at 57.  Plaintiff Vargas testified that during his yearly performance
review in February 2000, his supervisor "didn't tell me to quit, but he told me that it would be a good idea
for me to look for another job." Pls.' Ex. 24 at 31. Plaintiff Vargas further testified:  "Q. Why did you
leave Honeywell to work at Quatro? . . .  A. . . . I thought I was out of a job . . . because of all of the
impressions that the managers at Honeywell told me, including my supervisor . . . telling me that I should
look for a job, other subtle hints" that I was out of a job.  Def.'s Ex. H at 49-50.  Plaintiff Candelaria
testified that when he specifically asked Jim Deters whether he should leave or not, Deters responded:  "If
you find something better, go. It d[oes] not look good." Def.'s Ex. I at 39; id. at 56 (same). Plaintiff
Candelaria further testified that he "never went looking for a position" at Quatro. Id. at 39-40.  "I didn't go
and actually put an application in" with Quatro. "[T]hey were interviewing somebody else, and my name
came up with experience on some of the products they had, and they called me. . . .  So I never went
looking for a position."  Id.  Plaintiff Wood testified: "[M]anagement would talk to me. My engineer, . . .
they were telling me, they [all] were encouraging me to go to Quatro.  'It would be a good deal for you.' . .
. 'Rita, you're the only one that knows the FS-90 line, and, you know, you'd be good . . . .  [T]he company
is acting on your best interest to go to Quatro, because you stay here, you are going to get laid off.'" Def.'s
Ex. K at 45.  Plaintiff Wood further testified: "The reason I resigned from Honeywell is because . . . all the
management, they encouraged me to go to Quatro. . . .  I believed them.  I had put my full faith in
Honeywell.  . . . They told me . . . going to Quatro was for my best interest.  . . .  They all [management]
wanted me to go to Quatro.  . . . They encouraged me, very much so, to go over there because . . .  I knew
those lines. . . ."  Id. at 50-51.

[24] For example, the cited testimony of Plaintiff Torres is as follows:

    Q. When did you start looking for other work? A. I never really looked for

The evidence further supports that Defendant did not keep Plaintiffs fully and/or timely informed about the Malaysian outsource – that the layoffs were not as sure a thing as Defendant made it appear, that management had serious reservations about it, that dual employment with it and Quatro and voluntary severance would be disallowed, or that a backup plan might not be implemented in the event the Malaysian/ITG outsource was canceled – or otherwise allay fears regarding job (in)security.  Cf. e.g., Def.'s Ex. E at 71-72 (implication in April 2000 that the "facility" might stay open); Pls.' Ex. 16 at b (reported at Feb. 15, 2000, Cortez Exec. Rev. Bd. Mtg. that earlier estimate of ITG outsource cost split was inaccurate and "total savings impacted significantly").  Significantly, there is no evidence that at the time Plaintiffs were considering employment with Quatro or resigning, or at the time they resigned or were terminated, Plaintiffs were informed about the status of the Malaysian outsource.  Cf. Def.'s Ex. B at 97 (Bautista testified that Defendant lied about knowledge that Board work not leaving at the time of her resignation).[25]  The record also shows that the retention incentives to which Defendant refers

---

other work.  Q. How did you come to work at Quatro? A. Dolores Hoke from Quatro asked me to drop off my resume . . . .  Q. How did she know to come to you?  A. Because she . . . and a group of people from Quatro had been [coming] through.  They had been given tours of the facility at DAS. . . .  Q. Do you know how she had your name, how she was able to contact you? A. . . . I don't know why she specifically told me to drop off a resume.  Q. Where were you were working when she contacted you?  A. I was testing [at DAS].  Q. Did she talk to you in person or over the phone?  A. In person.  Q. What was she doing when she talked to you?  A. She had been going through on a tour, looking at all of the products . . . and seeing how everything ran.  Q. And when the tour was over she came and talked to you? . . .  A. Yes.  Q. Specifically, what did she say to you?  A. That I should drop off my resume at Quatro.

Def.'s Ex. L at 49-51.

[25] A blatant example is the evidence regarding Plaintiff Torres. Plaintiff Torres submitted an application with Quatro only after Quatro sought him out and requested he apply.  Plaintiff  Torres,

(Def.'s Supp. Mem., State Law Claims, Doc. No. 43 at 22) were not announced until sometime in

April and/or on May 18, 2000, (Def.'s Ex. A-7 at 4), after many of Plaintiffs had already been told

that it was in their best interest to leave and/or had resigned.

Moreover, dual employment with Quatro was not allowed, though at least one

management employee saw no conflict.[26]  Once they resigned or were terminated, Plaintiffs were

not allowed to return to their positions, even though the predicate for their departure, the

Malaysian outsource plan and layoffs, had been canceled.  See Def.'s Ex. D at 57-60; Pls.' Ex. 7

at 87, 100; Pls.' Ex. 12 at 78-80.  Cf. Def.'s  Ex. L at 62-63.  It is disputed whether Plaintiffs'

positions were eliminated or were refilled with contract employees.[27]

---

concerned he would be laid off as a result of the Malaysian portion of Project Cortez, while still working
for Defendant began working for Quatro on May 30, 2000.  On June 8, 2000, "Quatro staffing was
complete," as ten Honeywell employees had accepted positions with Quatro.  Pls.' Ex. 27d.  On June 20,
2000, Defendant terminated Plaintiff Torres for his dual employment with it and Quatro.  On June, 21,
2000, the Malaysian outsource plan was abandoned.  Defendant terminated Plaintiff Torres without
informing him that the layoffs would not occur, or even that they might not occur, and that the Quatro
outsource plan included the transfer of Honeywell employees to Quatro, preventing him from making an
informed decision about whether to continue his employment with Quatro and lose his position with
Defendant.

[26]  Pls.' Ex. 12 at 70 (Plaintiff Bautista testified that she asked Charlie Steele about working at
both Defendant and Quatro, to which Steele responded that if she could handle working two jobs, he didn't
see why not); Def.'s Ex. K at 69-70 (Plaintiff Wood asked Steele about working for both Defendant and
Quatro, and Steele replied that if she "wanted to work part-time at Honeywell and at Quatro, . . . there
wouldn't be a problem;" he "didn't see a problem with it.") and Mary Scott informed that HR was looking
into the issue, Def.'s Ex. L at 56 (Scott "would have to get with [HR at] corporate headquarters" to see if
dual employment was allowable); id. at 57 (Scott was still talking with headquarters about dual
employment, and "they hadn't gotten back with her").  Cf. Def.'s Ex. B at 82-83, 97-98 (Plaintiff Bautista
testified HR lied about looking into whether employees could work both for Defendant and Quatro)
There is some evidence that the ban on dual employment with Defendant and Quatro was not an
absolute – that it might have been allowed with the grant of "prior approval by the appropriate department
head." Def.'s Ex. R.

[27]  After the resignation or termination of Plaintiffs, Defendant contends that "Plaintiffs who went
to Quatro were not 'replaced' by contract workers, or by anyone else, because their jobs were eliminated
when the Legacy work was outsourced to Quatro."  Def.'s Reply (ERISA Claims, Doc. No. 41) at 8 (citing

Looking at the totality of the circumstances from the viewpoint of a reasonable person, the Court concludes there is sufficient evidence that Plaintiffs were constructively discharged and/or pretextually terminated. The record supports that Plaintiffs' employment choices were not free and informed.

As to the specific intent element of § 510, the trier of fact could conclude from the record that Defendant used constructive discharge/pretextual termination not only to ensure that a sufficient number of employees "transferred" to Quatro on schedule, but also to avoid severance pay obligations. It can be inferred from the record that Defendant did not inform Plaintiffs that it and Quatro needed employees with expertise to move to Quatro, nor request voluntary transfers/separations, because voluntary severance pay packages would have been necessary. Cf. Pls.' Ex. 7 at 98-99 (Defendant encouraged Legacy-line employees to leave and go to Quatro to get rid of them and avoid having to pay them severance packages); Def.'s Ex. I at 54-55 (There

---

"Deters Dep." [Pls.' Ex. 6] at 108-09). (Page 109 of the Deters deposition is not part of Pls.' Ex. 6 and, by itself, page 108 does not support the proposition for which it is cited.). Defendant further alleges that "the contract employees that were hired were hired into new positions . . . ." Id. (citing Pls.' Ex. 15 at 23-24). (It is not clear from page 24 of Plaintiffs' Exhibit 15 that the "new positions" referred to were truly "new.").

Plaintiffs' contend that their positions were filled with contract workers or other employees at lesser pay. Pls.' Resp. (ERISA Claims, Doc. No. 40) at 11-12 (citing Pls.' Ex. 7 at "x" [87-88; 100] (when Plaintiff Fishel requested to return to Honeywell, he was informed his position had been refilled by another employee at a lesser salary and contractors had been hired for other positions.); Pls.' Ex. 10 at "x" [57-59] (When Plaintiff Garcia called HR management employees Susan Kline and Mary Scott and asked for her job back she was told by Kline "no," they were going to downsize and by Scott "no way, you resigned."); Pls.' Ex. 12 at "x" [78-80] (When Plaintiff Bautista asked for her job back, Scott told her "no," that Defendant was hiring contractors.).

What Plaintiff Fishel actually testified to was that Defendant moved his predecessor into his position, giving him a "sizable pay increase to stay, as well as a performance percentage to stay;" hired contract workers at the lower level; and when he requested his job back, he was told that his position had been filled and if he were to return, it would have to be as an entry level contract worker. Pls.' Ex. 7 at 87, 100 (emphasis added). Plaintiff Garcia's testimony regarding what Scott told her is, more precisely, that "there was no way [she could have her job back], that we had resigned." Pls.' Ex. 10 at 59. (Scott denies making the above comments to Plaintiffs. Pls.' Ex. 29 at 35.)

was a motive to try to move people by their own means instead of having to give  severance

packages.).  If Plaintiffs had not left Defendant's employment voluntarily, had been allowed to

work for both it and Quatro, and/or had been allowed to return to Defendant's employ after the

cancellation of the Malaysian portion of Project Cortez, Defendant would have had to find other

Honeywell personnel for Quatro, requiring voluntary severance pay packages – especially after

the Malaysian outsource had been canceled and the fear of layoffs no longer existed.  Defendant is

silent as to its reasons for handling the Quatro outsource in the manner it did and in contrast to

the manner it publicly approached the Malaysian outsource, see Def.'s Ex. A-2 (To ensure that

employees affected by the decision were eligible for Defendant's Severance Pay Plan,  Defendant

had "chosen to notify all employees that they may be impacted or laid off as a result" of the Board

outsource decision.).  As a result, Defendant has failed to articulate any reason, much less a

legitimate business reason, in response to Plaintiffs' prima facie case.

Issues of material fact exist for Plaintiff's claims based on the Quatro outsourcing (in the

context of the Malaysian outsourcing plan), precluding summary judgment.  Therefore, as stated

previously in this opinion, while Defendant's motion for partial summary judgment on Plaintiffs'

ERISA claims is granted on the issue of whether the Malaysian outsourcing, in and of itself,

violated § 510, the motion is denied as to whether the Quatro portion of Project Cortez, in

combination with and in context of the Malaysian portion, violated § 510 of ERISA.

## C.    STATE LAW CLAIMS

All Plaintiffs bring a common law claim for fraud.  In addition to their fraud claims, the

Garcia Plaintiffs bring claims for negligent misrepresentation in conjunction with their fraud

33

claims,[28] and Plaintiff Campbell brings a claim for promissory estoppel.

### 1.      Promissory Estoppel

Plaintiff Campbell consents to the dismissal of her promissory estoppel claim.  Pls.' Resp. (State Law Claims, Doc. No. 45) at 16.  Consequently, Defendant will be granted summary judgment as to Plaintiff Campbell's promissory estoppel claim

### 2.      Fraud and/or Negligent Misrepresentation

Defendant contends that it is entitled to summary judgment as to Plaintiffs' remaining state law claims (fraud and/or negligent misrepresentation) because the claims are (1) preempted (at least partially) by ERISA; (2) improperly pled; and (3) without substantive merit, based on the undisputed material facts.[29]

####      a.      ERISA Preemption

Defendant's heading for, and the first portion of, its preemption argument in its supporting brief, is somewhat misleading. Def.'s Supp. Mem. (State Law Claims, Doc. No. 43) at 13-14. Defendant's bottom-line contention is not that ERISA preempts Plaintiffs' state law claims but that the claims are partially preempted.  Id. at 2;  Def.'s Reply. (State Law Claims, Doc. No. 46) at 3 (conceding not all Plaintiffs' state law claims preempted by ERISA).

---

[28] The Garcia Plaintiffs' claims for "fraud/negligent misrepresentation" will be construed consistent with the parties' construction of the claims – as claims for fraud or, in the alternative, for negligent misrepresentation.

[29] In its reply, (State Law Claims, Doc. No. 46 at 5-6) Defendant contends that pursuant to Local Rule 56.1(b), Plaintiffs have abandoned their fraud claims.  The Court is unpersuaded.  Although Plaintiffs fail to explicitly list fraud in the summary section of their response, Pls.' Resp. (State Law Claims, Doc. No. 45) at 16, the omission clearly appears to be inadvertent.  A review of Plaintiffs' response, taken as a whole, reveals that Plaintiffs' fraud claims remain a part of this action. While Plaintiffs certainly could have been more precise in drafting their response, the Court nonetheless determines that the fraud claims have been preserved.

Plaintiffs agree with Defendant that to the extent their fraud and/or negligent misrepresentation claims concern Defendant's Severance Pay Plan, those claims are preempted by ERISA.  Pls.' Resp. (State Law Claims, Doc. No. 45) at 14.  On this issue, both Defendant and Plaintiffs cite U. S. District Judge Bruce Black's January 3, 2002, opinion ruling that Plaintiff Campbell's state law claims are preempted by ERISA to the extent the claims are based on Defendant's Severance Pay Plan.  Id.; Def.'s Supp. Mem. (State Law Claims, Doc. No. 43) at 13-14; see Campbell v. Honeywell, Inc., No. Civ. 01-86 BB/LFG, Doc. No. 15 at 3.  Again citing to Judge Black's Campbell opinion, both parties also agree that ERISA does not preempt Plaintiffs' state law clams to the extent the claims are based on "'other independent promises and misrepresentations.'"  Def.'s Supp. Mem. (State Law Claims, Doc. No. 43) at 14 (quoting Campbell v. Honeywell, Inc., No. Civ. 01-86 BB/LFG, Doc. No. 15 at 3 ); Pls.'  Resp. (State Law Claims, Doc. No. 45) at 14.[30]

> b.    Particularity of Claims

Defendant argues that Plaintiffs' fraud and negligent misrepresentation claims fail because they are improperly pled under Federal Rule of Civil Procedure 9(b). Without  Tenth Circuit or United States Supreme Court precedent directly on point, the Court declines to expand the special pleading requirements of Rule 9(b) to include negligent misrepresentation. Alternatively, for the

---

[30] In its reply for its summary judgment motion as to the state law claims, Defendant acknowledges, that given Plaintiffs' response, the preemption issue now is moot. Def.'s Reply (State Law Claims, Doc No. 46) at 3 n.3.  Defendant goes on to explain that it made an ERISA preemption argument because Judge Black's January 3, 2002, Campbell opinion on the issue was not necessarily binding on the remaining Plaintiffs. Id.  The Court notes that rather than spending two-and half pages in its supporting memorandum arguing the point, Defendant counsel simply could have contacted Plaintiffs' counsel.  Such communication between Defendant's and Plaintiffs' counsel would have revealed to Defendant that Plaintiff Bautista and the Garcia Plaintiffs agreed with Defendant on this subject and eliminated the need for the Court to address the issue, saving all involved paper, time, and energy.

reasons given below, Defendant has waived its Rule 9(b) defense as to Plaintiffs' negligent misrepresentation claims.

Defendant is inconsistent and, in the end, untimely in its argument that Rule 9(b) is a defense to Plaintiffs' fraud (and negligent misrepresentation) claims.  Defendant filed no answer in response to Plaintiff Campbell's original complaint (01cv86, Doc. No. 1, filed Jan. 23, 2001) or her first amended complaint (01cv86, Doc. No. 3, filed May 16, 2001).  Consequently, Defendant raised no Rule 9(b) defense in an answer to Plaintiff Campbell's claims.  Further, Defendant did not raise Rule 9(b) as a defense in its July 20, 2001, motion to dismiss, or for summary judgment, as to Plaintiff Campbell's state law claims, including fraud and promissory estoppel.  While, in addition to the motion at bar, Defendant did raise Rule 9(b) as a defense in the parties' consolidated May 21, 2002, Pretrial Order, both are too late.  Defendant has waived its Rule 9(b) defense as to Plaintiff Campbell.  See Todaro, M.D. v. Orbit Int'l Travel, Ltd., 755 F.Supp. 1229, 1234 (S.D.N.Y. 1991); 2 James Wm. Moore et al., Moore's Federal Practice ¶ 9.03[5] at 9-30 (3d ed. 2001).

Defendant raised Rule 9(b) as a defense in its June 19, 2001, answer to Plaintiff Bautista's original complaint and, the Court presumes, to Plaintiff Bautista's first amended complaint. Def.'s Answer, 00cv1741, Doc. No. 10 at 7 ¶ 56 (Plaintiff's fraud claim "fails to comply with [Rule 9(b)] in that the circumstances of fraud are not stated with particularity.").  Defendant raised a duplicate Rule 9(b) defense (with no mention of the negligent misrepresentation claims), in its September 24, 2001, answer to the Garcia complaint. Def.'s Answer, 01cv910, Doc. No. 20 at 8 ¶ 50 ("Plaintiffs' fraud claim[s] fail[] to comply with [Rule 9(b)] in that the circumstances of fraud are not stated with particularity.").  As stated above, in addition to the motion at bar, Defendant

36

raised Rule 9(b) (as to both the fraud and the negligent misrepresentation claims) in the May 21,

2002, consolidated pretrial order. Doc. No. 51 at 11.  However, not only did Defendant not

explicitly raise Rule 9(b) as a defense in the <u>Bautista</u> Initial Pretrial Report (IPTR) (00cv1741,

Doc. No. 48, filed Mar. 26, 2002),[31] but it failed to raise Rule 9(b) as a defense to the <u>Garcia</u>

Plaintiffs' negligent misrepresentation claims before the May 21, 2002, consolidated pretrial

order.  Further, Defendant contends in its supporting brief for the motion at bar that "the factual

allegations concerning the other Plaintiffs' fraud and negligent misrepresentation claims are

materially indistinguishable from Plaintiff Campbell's fraud and promissory estoppel claims."

Def.'s Supp. Mem. (State Law Claims, Doc. No. 43) at 15.

 Given the length of time since Plaintiffs' original complaints and Plaintiffs Bautista and

Campbell's amended complaints were filed, the stage of the consolidate action,[32] the lack of an

explicit Rule 9(b) argument in the March 2002 <u>Bautista</u> IPTR, the lack of a negligent

misrepresentation Rule 9(b) argument in Defendant's answer to the <u>Garcia</u> complaint, the

admitted identical nature of the Plaintiffs' fraud/negligent misrepresentation/promissory estoppel

claims, and the absence of any contention in Defendant's July 20, 2001, motion that Plaintiff

Campbell's fraud and promissory estoppel claims failed because they did not meet Rule 9(b), it is

too late for Defendant now to raise Rule 9(b) as to Plaintiff Bautista and the <u>Garcia</u> Plaintiffs.

See <u>Burton v. R.J. Reynolds Tobacco Co.</u>, 181 F.Supp.2d 1256, 1262 n.5. (D. Kan. 2002).  "The

---

[31] Defendant's contentions in the March 2002 <u>Bautista</u> IPTR were "Plaintiff's common law claims are preempted by ERISA," 00cv1741, Doc. No. 48 at 4, and it "intends to file: [M]otion to dismiss all state court claims on ERISA preemption grounds; motion for more definite statement of, or to dismiss, the fraud claim; motion for summary judgment," <u>id.</u> at 13. Defendant did not file a motion for more definite statement in <u>Bautista</u> or in either of the remaining actions.

[32] After an extension, discovery ended in all three actions on February 8, 2002.

requirement that fraud [and negligent misrepresentation, if applicable] shall be stated with particularity primarily is to allow the defendant to prepare an adequate responsive pleading." Sithon Maritime Co. v. Holiday Mansion, 983 F.Supp. 977, 990 (D. Kan. 1997) (citing Todaro, 755 F.Supp. at 1234).  If Plaintiffs' pleadings were insufficient under Rule 9(b), Defendant should have raised the relevant issue in an answer, an earlier motion(s), in the March 2002 Bautista IPTR, or before the close of discovery.  Consequently, the Court concludes that Defendant had ample opportunity before the motion at bar to raise and plead its Rule 9(b) argument(s) and failed to do so.  Therefore, in addition to Plaintiff Campbell, Defendant has waived any objection to the fraud (and/or negligent misrepresentation) claims on the ground of insufficient particularity as to Plaintiff Bautista and the Garcia Plaintiffs.

> c.   Merits

The New Mexico Court of Appeals has distinguished the elements of negligence and fraud as follows:

> (1) fraudulent misrepresentation requires an untrue statement, while negligent misrepresentation may involve a statement that is "literally true" but misleading; (2) fraudulent misrepresentation requires the defendant to make the statement recklessly or with knowledge that it is false, while negligent misrepresentation only requires a failure to exercise ordinary care in obtaining or communicating the statement; (3) fraudulent misrepresentation requires an intent to deceive, while negligent misrepresentation only requires an intent that the plaintiff receive and be influenced by the statement where it is reasonably foreseeable that the plaintiff would be harmed if the information was incorrect or misleading.

Eckhardt v. Charter Hosp. of Alb., Inc., 1997-NMCA-017 ¶ 20, 124 N.M. 549, 562, 953 P.2d 722, 735 (N.M. Ct. App. 1997). The elements of fraud under New Mexico law are:  (1) an untrue representation of fact was made by the defendant; (2) of which the falsity was known to, or the representation was recklessly made by, the defendant; (3) the defendant made the representation

to deceive and to induce the plaintiff to rely on the representation; and (4) the plaintiff did in fact

rely on the representation.  NM UJI 13-633 (NMRA 2002).  The elements of negligent

misrepresentation under New Mexico law are:  (1) the defendant made a false representation of

fact or a representation of fact that, while literally true, was misleading; (2) the defendant did not

exercise ordinary care in obtaining or communicating the information conveyed; (3) the defendant

reasonably should have foreseen that the plaintiff would be harmed if the information conveyed

was not correct or was misleading; and (4) the plaintiff justifiably relied on the information.  NM

UJI 13-1632 (NMRA 2002); see id. at Committee Comment ("This instruction deals with

misrepresentations resulting from negligence in the furnishing of false information or information,

while true as far as it goes, is incomplete in a material respect and therefore misleading.").[33]

Only fraud elements one through three and negligent misrepresentation elements one and

two are contended by Defendant as unmet by Plaintiffs.  Defendant contends Plaintiffs have not

identified any false or misleading statements it made.  Assuming Plaintiffs succeed in establishing

the first element of fraud or negligent misrepresentation, Defendant further argues that Plaintiffs

have not demonstrated that it made any such statements knowing they were false, in reckless

disregard for the truth, or did so failing to exercise ordinary care.  Finally, as to the fraud claims,

Defendant contends Plaintiffs will be unable "to prove that Honeywell made any such statement in

---

[33] As for misrepresentation based on omission of information and the duty not only to refrain from making affirmative misrepresentations, but the duty to disclose, the status of New Mexico law  is equivocal. Compare NM UJI 13-1632 (NMRA 2002) at Directions for Use (UJI 13-1632 "addresses claims of negligent misrepresentation based on an allegedly incorrect or misleading disclosure of information.  It does not address claims of misrepresentation based on a failure to disclose any information.") with id. at Committee Comment ("It is possible that a negligent misrepresentation claim may also arise from a failure to disclose any information."  It is the responsibility of the court, with the assistance of counsel, "to determine whether and how the jury should be instructed with respect to such a claim.").

an effort to induce Plaintiffs to take positions with Quatro prior to any layoff or business

completion date."  Def.'s Supp. Mem. (State Law Claims, Doc. No. 43) at 22.

  When viewed in the light most favorable to Plaintiffs, with all doubts and factual

inferences considered in favor of the existence of triable issues, issues of genuine material fact

exist as to Plaintiffs' fraud and/or negligent misrepresentation claims.  There is contested evidence

whether Defendant through its management employees intentionally or negligently represented

that it would be open and honest with its employees, the Malaysian outsource was a done deal, or

large layoffs were imminent when they knew or should have known otherwise.[34]  Furthermore, at

the outset of the Malaysian outsource, in response to employee questions, Defendant informed

that a secondary supplier had been identified and, when questioned about any problems with the

Malaysian outsource, Defendant represented at All Employee Meetings that if problems

developed, alternative plans for the outsource were in development.  There is no evidence,

however, that a secondary supplier was used, that any alternative plans were instituted when the

---

[34]  Contrary to Defendant's argument, the evidence supports that rather than conveying "that layoffs were possible, even likely," id. at 19, Defendant conveyed the Malaysian outsource decision was final and, thus, layoffs were a certainty, albeit, beginning with contract workers.  See, e.g., Def.'s Ex. A-2 (Nov. 9, 1999, Official Notice that "the H&BC  Products leadership team has decided to outsource the [Board] work currently being performed here in Albuquerque. . . . This decision affects about 200 of the 300 employees at this site."); Def.'s Ex. A-3 (Dec. 6, 1999, announcement that "the H&BC Products leadership team has decided to outsource the [Board] work currently performed in Albuquerque as part of an initiative to increase our competitiveness and reduce costs"); Pls.' Ex. 15 at 9 (Steele Dep.) ("Q. So[,] on October 19, 1999, was the tone of that [Key Messages/All Employee Meeting] just to explore the possibility of outsourcing?  A. I don't believe so. I think it was pretty clear to me that the decision had been made that it would be outsourced."); Def.'s Ex. A-6 (Apr. 11, 2000, All Employee Meeting/Key Messages/Q&A, discussing details of ITG outsource, with no indication that outsource was only a possibility); Def.'s Ex. A-7 at 4 (May 18, 2000, All Employee Meetings/Q&A,"It's unlikely that the decision will be reversed at this point.").  Cf. Pls.' Ex. 22 (edited Nov. 24, 1999, New Mexico Business Journal Statement)); Pls.' Ex. 7 at 51 (Pl. Fishel Dep.) ("[W]e would question them about 'Is it possible that things will turn around? Is it possible that we'll get new product in, that the facility won't close?' The reaction was, 'It's possible, but remotely.'").

Malaysian portion of Project Cortez failed, or that the factors underlying Defendant's decision to use, or not use, a secondary supplier or alternative plans were relayed to nonmanagerial employees.

There are further issues of genuine, triable material fact concerning whether Defendant, through its management employees, lied and/or made intentional or reckless misrepresentations in statements urging Plaintiffs to seek new employment (including the reasons why Plaintiffs should do so) or in statements about the reason why Plaintiffs could not return to its employ from Quatro.  There also is evidence, direct and/or inferential, that, before and at the time of Plaintiffs' separations, Defendant through its management employees made statements omitting material information regarding the human resource requirements of the Quatro outsource and the status of the Malaysian outsource.  There is further evidence, that the misrepresentations (reckless, intentional, and/or by omission) were made in an effort to induce Plaintiffs to transfer to Quatro, to choose employment with Quatro over it, and/or to ensure they remained with Quatro so that Defendant's human resource obligations with Quatro would be timely fulfilled.  Finally, as to the negligent misrepresentation claims, the evidence supports that Defendant violated the standard of care it contends is appropriate for business decisions impacting employees. See Def.'s Supp. Mem. (State Law Claims, Doc. No. 43) at 19-20 ("Whatever the standard of ordinary care may be, Honeywell's conduct clearly exceeded it. . . .  It is hardly a desirable standard of care" to keep one's employees in the dark regarding business decisions such as layoffs.). Cf. at 2 (Keeping employees in the dark when job cuts are considered is "absurd.").

Plaintiffs have produced evidence from which a reasonable trier of fact could conclude

41

that, in the full context of the Quatro outsourcing ( i.e., based on both Defendant's attempts to outsource to Malaysia and its successful outsourcing to Quatro in Albuquerque), Defendant either fraudulently or negligently communicated information to Plaintiffs, including the omission of material information. Because issues of genuine material fact remain as to Plaintiffs' fraud and/or negligent misrepresentation claims, summary judgment is precluded.  Consequently, Defendant's motion for partial summary judgment as to Plaintiffs' fraud and/or negligent misrepresentation claims will be denied.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion for Partial Summary Judgment as to Plaintiffs' Race and Age Discrimination Claims, filed March 5, 2002 **[00cv1741, Doc. No. 33],** is GRANTED, as uncontested;

**IT IS FURTHER ORDERED** that Defendant's Motion for Partial Summary Judgment as to Plaintiffs' ERISA claims, filed March 6, 2002, **[00cv1741, Doc. No. 37]**, is

(1) GRANTED, in so far as the claims are based solely on the Malaysian outsourcing; and

(2) DENIED, in so far as the claims are based on the Quatro portion of Project Cortez, in combination with and in context of the Malaysian portion.

**IT IS FURTHER ORDERED** that Defendant's Motion for Partial Dismissal or, in the Alternative, for Partial Summary Judgment as to Plaintiffs' claims for fraud, negligent misrepresentation, and/or promissory estoppel, filed March 7, 2002, **[00cv1741, Doc. No. 42]**, is

(1) construed as a motion for partial summary judgment;

(2) GRANTED, as uncontested, as to Plaintiff Campbell's state law claim for promissory

estoppel; and

(3)  DENIED, as to Plaintiffs' remaining state law claims.

_____
                  UNITED STATES DISTRICT JUDGE